IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| JANE DOE, a minor individual proceeding under an assumed name, by and through her Guardian *Ad Litem,* Farley, Piazza & Associates, | ) ) ) ) | Civil No.: 3:10-cv-01172-JE |
| Plaintiff, | ) ) ) | OPINION AND ORDER |
| v. | ) ) | |
| GLADSTONE SCHOOL DISTRICT, an Oregon Public School district, authorized by the laws of the State of Oregon; ROBERT STEWART, in his individual capacity; NANCY BAILEY, in her individual capacity; and KIM NOMENSON, in her individual capacity; | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Jill Odell
Gibson Law Firm LLC
One World Trade Center
121 SW Salmon Street, 11th Floor
Portland, OR 97204

Attorney for Plaintiff

Barrett C. Mersereau
Peter Mersereau
Mersereau & Shannon, LLP
One SW Columbia Street
Suite 1600
Portland, OR 97258

    Attorneys for Defendants

JELDERKS, Magistrate Judge:

Plaintiff Jane Doe, by and through her Guardian *Ad Litem,* asserts claims against Defendant Gladstone School District (Defendant District) and three of the District's employees (Individual Defendants) under Title VI of the 1964 Civil Rights Act (42 USC §2000d) and the Equal Protection Clause of the Fourteenth Amendment (42 USC §1983). Plaintiff also asserts supplemental state claims of negligence and negligence *per se*. The Defendants move for summary judgment on all claims and, in their Reply Memorandum move, to strike certain evidence submitted by Plaintiff in support of her Response to the motion for summary judgment.

For the reasons set out below, Defendants' motion for summary judgment is granted in part and denied in part and Defendants' motions to strike are granted in part and denied in part.

## **Background**

Plaintiff was born in Portland, Oregon. Her mother is African-American and her father is Haitian. In 2009-2010, Plaintiff attended Kraxberger Middle School ("Kraxberger") in the Gladstone School District for her seventh grade year. She was twelve years old and was the only black female student in her grade. The 2009-2010 school year was the only year Plaintiff attended Kraxberger. Following her seventh grade year, Plaintiff transferred to the North Clackamas School District.

OPINION AND ORDER – 2

Defendant Gladstone School District operates one elementary school, one middle school and one high school.  During the 2009-2010 school year, Defendant Robert Stewart was the district superintendent, Defendant Nancy Bailey was the principal at Kraxberger and Defendant Kim Nomenson was one of Kraxberger's school counselors.  Kraxberger enrolled approximately 550 students.

During the 2009-2010 school year, the District had in place a policy prohibiting hazing, harassment, intimidation, menacing, bullying and other forms of student misconduct.  According to the District's policy, "harassment," "intimidation" and "bullying" mean

> any act that substantially interferes with a student's educational benefits, opportunities or performance, that takes place on or immediately adjacent to school grounds, at any school-sponsored activity, on school-provided transportation or any official school bus stop, and that has the effect of:
> a.  Physically harming a student or damaging a student's property;
> b.  Knowingly placing a student in reasonable fear of physical harm to the student or damage to the student's property; or
> c.  Creating a hostile educational environment.

In addition, Kraxberger Middle School had a "Student Handbook" which was available to students either in hardcopy or online.  The Handbook included procedures for student or parent complaints, specific procedures for dealing with harassment complaints, and a "Student Code of Conduct" which defined "problem areas" or "infractions" and suggested a range of consequences for disciplinary infractions.

Defendants assert that, in addition to the above policies, the District provided workshops and training seminars to District staff covering issues of respect, tolerance, cultural and economic diversity and bullying and harassment.

In her Declaration, Bailey describes her development and implementation of an "anti-bullying/harassment curriculum" as part of an "Advisory program."  This curriculum, as Bailey describes it, incorporated student discussion and activities designed to "increase cultural

tolerance, enhance mutual respect, and decrease student conflict and harassment." Bailey also asserts that a student assembly devoted to anti-bullying and anti-harassment was held in May 2010 as part of this curriculum.

Defendant Bailey's Declaration sets out the district policy-based procedure used at Kraxberger to respond to complaints of student misconduct, including harassment and bullying. Those steps were described as follows:

(1) If a staff member learns of or witnesses the misconduct, he/she will interject and stop the conduct.

(2) Depending on the circumstances, one or all of the involved students may be removed from the classroom or area where the conduct occurred.

(3) The staff member would discuss the situation with the students if possible, or contact the office for administrative assistance.

(4) The staff member would report such an incident or any report of discrimination, harassment or bullying to the administration for further action.

(5) The administration would follow up with the students and may contact the students' parents. Specific discipline may follow, depending on the circumstances.

According to Superintendent Stewart, this type of process at the school level would generally be used to address student conduct and discipline and, absent extenuating circumstances, the Superintendent would not become aware of or participate in individual student complaints of peer harassment or bullying.

Plaintiff asserts that toward the beginning of her school year at Kraxberger, student "A" pushed Plaintiff into a locker and called her "nigger." Principal Bailey placed both Plaintiff and student "A" in timeout. Plaintiff testified that Bailey told her that she was being put in timeout because she had pushed student "A."[1]

---

[1] All references to testimony are to deposition testimony.

OPINION AND ORDER – 4

Plaintiff asserts that in November, 2009, student "B" pushed Plaintiff's cafeteria tray away and said "No niggers allowed to sit here."  Plaintiff reported this incident to Bailey.  Bailey testified that she went through an hour and a half to two hour process interviewing students, including student "B," and determined that student "B" had said something to the effect of "Why, because she's black."  Bailey characterized the remarks made by student "B" as "something short" and "inappropriate."  Bailey did not take any notes from her conversations, prepare anything in written form after the incident or complete a disciplinary referral for student "B."  Bailey testified that student "B"'s  mother arrived at the school after the incident, wanted student "B" to apologize to Plaintiff and told Bailey that she was going to take student "B" home for the rest of the day.  Plaintiff testified that, after this incident, Bailey told her that "Gladstone kids" were not used to being outside the district and did not know how it was for a black person.

On November 10, 2009, Plaintiff's mother visited the District office.  Plaintiff's mother testified that she spoke with Pia Leonard, the District's Human Resources Director, and asked to speak with Superintendent Stewart.  However, handwritten notes of the meeting and the subsequent communications from the District office to Bailey were from Glenda Schmutzler, the Superintendent's Administrative Assistant.  Plaintiff's mother testified that when she asked to speak to the Superintendent she was told to address her concerns on a piece of paper and was handed "a ripped piece of paper" and told to write on the back of it.  Plaintiff's mother also testified that, through her friend Tyronne Sanders, she made out a written complaint regarding the problems Plaintiff was having at school.

Bailey testified that after receiving information from Schmutzler about Plaintiff's mother's visit, she contacted Superintendent Stewart who asked her to set up a meeting at the school level.  Bailey, school counselor Kim Nomenson, Plaintiff, Plaintiff's mother and

OPINION AND ORDER – 5

Plaintiff's mother's friend, Tyronne Sanders, met on November 13, 2009 at Kraxberger. Plaintiff's mother discussed her concerns and asked that Bailey and Nomenson hold an assembly "setting the tone" regarding respect.  Plaintiff's mother testified that Bailey told her that Gladstone students were not used to the outside world.  Bailey asserts that she explained the school's Advisory Program, that the meeting ended "very positively."  Bailey also asserts that after the meeting she made an extra effort to check in with Plaintiff at school to see how she was doing until she was told by another student that Plaintiff did not want Bailey to be her "friend." In her testimony, Plaintiff describes Bailey's checking in as "following [her] around" and "checking up on [her] . . . 24/7" as if Bailey was "concerned that [Plaintiff] was the problem."

Plaintiff asserts that on January 26, 2010, two male students, "D" and "E," pushed Plaintiff's head into a locker and shouted "nigger" at her.  Plaintiff asserts that she reported the incident to Vice Principal Kevin Anderson.  While Plaintiff was reporting the incident, the same two boys walked by and Plaintiff swore at them, for which Anderson admonished her.  Anderson asserts that he conducted an investigation, including reviewing the surveillance video of the incident and interviewing the two male students involved and an independent witness, and concluded that the students had pushed Plaintiff accidentally.  Anderson asserts that at no time did anyone, including Plaintiff, indicate that any racial language was exchanged between the students.  Anderson concluded that no discipline was warranted.  Bailey testified that on January 27, 2010, she received a message from Plaintiff's mother that she would be keeping Plaintiff home "until things resolved."  Bailey asserts that she attempted to set up a meeting with Plaintiff's mother on January 28, 2010 to discuss the incident further but that Plaintiff's mother cancelled.

OPINION AND ORDER – 6

Plaintiff asserts that after January 2010, Plaintiff was teased about having "Haitian body odor" and was called "HBO." Plaintiff also asserts that she reported to Bailey an incident in which student "C" told her she had Haitian body odor and that Bailey said she would talk to student "C." There is no record of a response or of any discipline being imposed after this incident.

In February of 2010, Plaintiff wrote about racism in a state writing test. The paper was flagged as a "crisis paper" by the Oregon Department of Education and copies were sent to the District. Bailey, Nomenson and Anderson had a meeting to review the paper but did not discuss it with Plaintiff or Plaintiff's mother or ask Plaintiff if she was talking about Kraxberger specifically in her paper. Bailey testified that the consensus between her, Anderson and Nomenson was to "continue doing what we were doing . . . ."

In her Declaration, Plaintiff describes 20 separate incidents between March and June of 2010 in which no fewer than 20 students directed inappropriate comments or behavior towards her. She asserts that:

> On March 18, 2010, student "F," told Plaintiff that he had heard that black people put mayonnaise in their hair. Plaintiff's math teacher, Tracy Skowhede and special education assistant Ginger Green responded to Plaintiff's complaint of being called "mayonnaise" by taking Plaintiff and the other student out in the hall. Green asserts neither student gave any indication that the mayonnaise comment had anything to do with race. She asserts she told the students that when she was growing up, women used mayonnaise in their hair as a hot oil treatment and that the students could look it up on the internet. Plaintiff testified that Green told her that African-Americans used mayonnaise in their hair.

OPINION AND ORDER – 7

On March 26, 2010, student "G" called Plaintiff "shit oreo."

On April 2, 2010, student "H" told Plaintiff that "nigger" was her favorite word.

On April 7, 2010, student "I" said to Plaintiff, "Hey nigger, do you have any mayonnaise?"

On April 8, 2010, during lunch, student "C" spit on Plaintiff's food and said that she did not like black people. She also said that all black people stink and that they do not deserve to live.

On about April 13, 2010, student "I" told Plaintiff that she was as dark as the sky. Plaintiff asserts that she told Bailey about the incident but student "I" continued to make the comment.

On the same day, student "J" told Plaintiff that she was as dark as charcoal.

Also on the same day, during math class, student "K" called Plaintiff a nigger and said that she put mayonnaise in her hair.

On April 30, 2010, student "L," told another white student, student "M," to take a package of mayonnaise to Plaintiff and tell her to put it in her hair, which  he did. Students "L" and "M" were disciplined with "timeouts" and written referrals were completed by Bailey reflecting this discipline.

On May 5, 2010, students "N," "O," "A," and "P," pointed out to the class that Plaintiff had paint in her hair and said that she should wash it out with mayonnaise.

On May 6, 2010, student "Q," told Plaintiff that her nickname should be "Mayonnaise."

On May 7, 2010, student "R" told Plaintiff that she looked like "poop."

On May 10, 2010, student "Q" told Plaintiff again that her nickname should be "Mayonnaise," and student "S" cursed at Plaintiff.

OPINION AND ORDER – 8

On May 11, 2010, student "Q" again called Plaintiff "Mayonnaise."

On May 17, 2010, students "T" and "U" told Plaintiff that Plaintiff put mayonnaise in her
hair and that she had a disease.

On May 20, 2010, student "V," told other students in front of Plaintiff that she put
mayonnaise in her hair.

On June 2, 2010, several students yelled "nigger" at Plaintiff and threw paper at her.

On June 3, 2010, student "S" called Plaintiff "Mayonnaise."  Plaintiff asserts that on that
same day, while she was walking in the parking lot, students "W" and "X"
approached her and student "W" asked Plaintiff if she would ever consider him
black. Then student "X" asked student "W" if he would ever consider Plaintiff
white and student "W" said "fuck no."

On June 4, 2010, student "S" told Plaintiff that she needed a "haircut, greaser."

On June 11, 2010, the last day of school, student "C" told Plaintiff that she did not like
black people and that all black people stink because they are so black.  Bailey
issued student "C" a disciplinary referral and contacted the student's parent.

Plaintiff asserts that each of these incidents was reported to a staff member at Kraxberger,
primarily to Bailey.  According to Plaintiff, Bailey's responses to her ranged from assurances
that she would talk to the offending student to comments such as "Oh, well."  One of Plaintiff's
fellow students testified that, on occasion, Bailey responded to complaints of name calling by
telling Plaintiff, "Just ignore it and it will stop."

Though Defendants do not deny that several incidents involving Plaintiff occurred over
the school year, staff members deny that many of the comments, especially those regarding
mayonnaise, were reported to them as having racial overtones or being racially motivated.  In her

Declaration, Bailey describes the reported misconduct as "inappropriate" comments and "teasing." She also asserts that she responded promptly to each report received and either talked to or disciplined each of the students Plaintiff or others identified as making inappropriate comments.

On April 19, 2010, Plaintiff attended a meeting with Bailey, Nomenson, Anderson, Leonard, her mother and her mother's advocate/friend Tyronne West. The tone and content of the meeting are described very differently by Bailey and Plaintiff. Both agree that Plaintiff shared her concerns regarding the comments that were being directed toward her. Plaintiff asserts that Bailey "started crying" and explained that Gladstone students were not used to being outside the district. Bailey asserts that she tried to explain the district's attempts to respond to Plaintiff's complaints but was repeatedly cut off by Plaintiff's mother. The parties agree that Plaintiff's mother ultimately became angry and left the meeting.

On April 21, 2010, Bailey met with Lori Chambers, one of Plaintiff's teachers. Chambers asserts that Bailey informed her that Plaintiff had identified Chambers as someone she could trust. Chambers asserts she agreed to be Plaintiff's "go to person" when Plaintiff had concerns or wanted to talk. She also asserts that Plaintiff then joined this meeting and discussed specific instances of students making inappropriate comments, particularly those about "mayonnaise."

Plaintiff was absent ten days during the school year and finished her year at Kraxberger with a 3.25 cumulative grade point average. Plaintiff asserts that she stayed home seven of those ten days because of "the racial discrimination and bullying." Plaintiff's mother testified that Plaintiff's grades at Kraxberger were "good" but "not her best." After her seventh grade year at Kraxberger, Plaintiff transferred to the North Clackamas School District.

OPINION AND ORDER – 10

## Claims

Plaintiff brings five claims.  The first claim alleges that the Defendant District violated 42 U.S.C. §2000(d) (Title VI) by discriminating against Plaintiff through its "deliberate indifference" to racial and national origin harassment of Plaintiff by other students at Plaintiff's school.

Plaintiff's second claim alleges that the Defendant District violated Plaintiff's rights to equal protection under 42 U.S.C. §1983 by depriving Plaintiff of the right to attend school free of "overt, pervasive, and officially countenanced racial and national origin harassment."

Plaintiff's third claim alleges that Defendants Stewart, Bailey and Nomenson, in their individual capacities, violated Plaintiff's rights to equal protection under 42 U.S.C. §1983 in their responses to Plaintiff's complaints of racial harassment.

Plaintiff's fourth claim alleges that all Defendants were negligent in their failure to protect Plaintiff from harassment and bullying and that the conduct of the individual Defendants showed "malice or a reckless and outrageous indifference to a highly unreasonable risk of harm" such that Plaintiff is entitled to an award of punitive damages.

Plaintiff's fifth claim alleges that all Defendants were negligent *per se* by violating state statutes and rules which prohibit harassment, bullying and discrimination in public schools and require school districts to develop and implement plans to assure that students are not harassed and bullied.

## STANDARDS FOR EVALUATING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law.

OPINION AND ORDER – 11

The moving party must show the absence of an issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The moving party may discharge this burden by showing that there is an absence of evidence to support the nonmoving party's case.  Id.  When the moving party shows the absence of an issue of material fact, the nonmoving party must go beyond the pleadings and show that there is a genuine issue for trial.  Id. at 324.

The substantive law governing a claim or defense determines whether a fact is material. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Reasonable doubts concerning the existence of a factual issue should be resolved against the moving party.  Id. at 630-31.  The evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  No genuine issue for trial exists, however, where the record as a whole could not lead the trier of fact to find for the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## Discussion

### I.  Motions to Strike

In their Reply Memorandum, Defendants move to strike certain evidence submitted by Plaintiff in support of her Response to the motion for summary judgment.[2]  Defendants move to strike the last two sentences in paragraph 5 in Plaintiff's mother's Declaration on the ground that the statements constitute inadmissible hearsay evidence.  The sentences describe contact Plaintiff's mother asserts she had with a Civil Rights Education Program Specialist from the Oregon Department of Education.

---

[2] Because these motions were raised in the context of Defendants' Reply Brief, they have not been separately docketed.  Nevertheless, to clarify the evidence considered in reaching my conclusions below, I briefly address them as distinct motions here.

OPINION AND ORDER – 12

Defendants also move to strike Exhibit 1 to Jill Odell's Declaration on the ground it constitutes inadmissible hearsay evidence, and on the additional ground that it is dated after the plaintiff transferred out of the defendant district. This exhibit is a "Dear Colleague" letter dated October 2010 from the U.S. Department of Education Office for Civil Rights regarding Harassment and Bullying

Finally, Defendants move to strike pages 60-65 in Exhibit 10 to Jill Odell's Declaration on the ground that these pages contain inadmissible hearsay evidence. Defendants argue that it was established in Plaintiff's deposition that these pages, which are attached to Plaintiff's journal, contain handwritten statements from the Plaintiff's mother. Defendants also argue that, in addition to constituting hearsay evidence, these pages relate to matters involving Plaintiff's prior school district, and are therefore not relevant.

Defendants' motion as to Exhibit 1 to the Odell Declaration is granted and the court will not consider the exhibit as part of this Opinion and Order. The motions are otherwise denied and the evidence will be admitted, not for the truth of what it contains, but simply to help establish context for the relevant events that occurred.

## II.  **Title VI Claim**

Title VI of the 1964 Civil Rights Act, 42 U.S.C. §2000(d), prohibits discrimination based on race, color or national origin in programs and activities that receive federal funding. Under Title VI, only acts of intentional discrimination are prohibited. Alexander v. Sandoval, 532 U.S. 275 (2001). In litigation concerning student-on-student harassment brought under Title IX of the 1964 Civil Rights Act, the U.S. Supreme Court held that schools districts may be liable if they are "deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of

OPINION AND ORDER – 13

access to the educational opportunities or benefits provided by the school." Davis v. Monroe County Board of Education, 526 U.S. 629, 650 (1999); see also Fitzgerald v. Barnstable School Committee, 555 U.S. 246, 250-251 (2009). Because the Court has emphasized that Title IX was modeled on Title VI, I am confident it would apply the same standard where, as here, an action alleging racial discrimination is brought under Title VI. See Fitzgerald,.555 U.S. at 258-259.[3]

## A.  **Racially Hostile Environment**

Here, Defendants move for summary judgment on Plaintiff's Title VI claim, contending that neither were they "deliberately indifferent" to Plaintiff's reports of harassment nor was the harassment of Plaintiff sufficiently severe, pervasive or objectively offensive to have deprived her of access to educational opportunities or benefits.

Defendants argue that the alleged racial harassment of Plaintiff was not sufficiently severe, pervasive or objectively offensive that it deprived Plaintiff of the educational opportunities or benefits offered by the district. However, after a careful review of the record, I conclude that a trier of fact who credited Plaintiff's description of these incidents could conclude that a racially hostile environment existed at Kraxberger.

As discussed above, the record includes evidence from which a reasonable trier of fact could conclude that Plaintiff was subjected to an array of offensive conduct including being pushed and called "nigger," being refused a seat at a cafeteria table and told "no niggers are allowed to sit here," having her food spit on, being told that "all black people stink," and being teased about using mayonnaise in her hair and having "Haitian body odor." There is evidence that this conduct occurred throughout Plaintiff's seventh grade year, up to and including the last

---

[3] Although Plaintiff argues that this court should apply the standard for student-on student harassment set out in Monteiro v. Tempe Union High School Dist., 158 F.3d 1022 (9th Cir. 1998), I am confident the correct standard is that set out by the U.S. Supreme Court in Davis. Nevertheless, in analyzing Defendants' motion for summary judgment as to Plaintiff's Title VI Claim, I would reach the same conclusion whether I applied the standard as set out in Monteiro or as set out in Davis.

OPINION AND ORDER – 14

day of school.  Plaintiff has produced evidence that the harassment was perpetuated by no fewer than 24 students and perhaps, according to one of Plaintiff's former classmates, as many as 60. In addition, Plaintiff has produced evidence that she failed to attend school on several occasions, at least in part, as a result of the conduct of her peers and that her grades, though "good," were "not her best."  Plaintiff has shown the existence of evidence from which a reasonable trier of fact could conclude that a racially hostile environment existed at Kraxberger during Plaintiff's seventh grade year.

## B. **"Deliberate Indifference"**

In analyzing liability under Title IX, the Supreme Court held that the standard for finding "deliberate indifference" to acts of student-on-student harassment was whether "the [school's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."  Davis, 526 U.S. at 648 (1999).

As noted above, the language of Title IX is patterned after Title VI. The Supreme Court and the Ninth Circuit have applied Title IX standards, including the "deliberate indifference" standard, to Title VI for "most purposes."  Lanier v. Fresno Unified School Dist., 2011 WL 4565777 at *6 (E.D. Cal.) (citing Grove City College v. Bell, 465 U.S. 555, 653–570 (1984); Radcliff v. Landau, 883 F.2d 1481, 1483 (9th Cir. 1989)).

The next question then is, as a matter of law, what is a "clearly unreasonable" response for purposes of determining deliberate indifference.  See Davis, at 648-649.  Defendants argue that the Ninth Circuit has set a very high standard for what constitutes a "clearly unreasonable" response, interpreting it strictly to require an "'official decision . . . not to remedy the violation.'" Oden v. N. Marianas College, 440 F. 3d 1085, 1089 (9th Cir. 2006) (quoting Gebser v. Lago Vista Independent School Dist., 524 U.S. 274, 290 (1998)).  A defendant need not provide a

particular remedy or even purge the school of all racial harassment but the response must be made "in light of the known circumstances." Davis, at 648-649.

The parties cite and I have reviewed a number of Title IX and Title VI cases from the various Circuit and District courts that have dealt with the question of deliberate indifference. These decisions address such a broad spectrum of conduct and responses by school districts, and such a diversity of court analyses, that the guidance they offer is, at best, general.  What can be drawn from these cases is that school districts that do nothing to remedy harassment and districts that persist in the same attempts at remediation despite actual knowledge of their ineffectiveness, both demonstrate "deliberate indifference".  See, e.g. Monteiro, 158 F. 3d at 1034 (describing allegations that "nothing" was done in response to complaints of harassment); Vance v. Spencer County Public School Dist., 231 F. 3d 253, 261 (6th Cir. 2000)(continuing with same methods after actual knowledge that remediation is ineffective); Flores v. Morgan Hill Unified School District, 324 F. 3d 1130, 1335-36 (9th Cir. 2003)(finding of deliberate indifference for failure to take any further steps once remedial measures were known to be inadequate).

Plaintiff here does not argue that the Defendant District took no action in response to her complaints.  She does, however, assert that the District's response was inadequate in light of the circumstances.  Plaintiff has produced evidence from which a trier of fact could conclude that offensive behavior was perpetuated by a large number of students, that the District responded with mild discipline and was aware that its responses were ineffective and that certain students who were disciplined repeated their conduct.

Defendants contend that "it cannot plausibly be argued that defendants had 'actual knowledge' that their multiple responses to plaintiff's complaints . . . were 'ineffective.'"  I disagree.  The record before the court includes evidence supporting the conclusion that

OPINION AND ORDER – 16

misconduct escalated over the course of the year and that Defendants were aware of this. Plaintiff has shown the existence of evidence that there was repeated misconduct by certain students and that Defendants were aware of this as well.  There is also evidence supporting the conclusion that the Defendants' responses to reported misconduct were inconsistent with the District's written policy and with the severity of the alleged offenses.  Plaintiff has produced sufficient evidence from which a trier of fact could conclude that the District was "deliberately indifferent" to student-on-student racial harassment at Kraxberger.  Accordingly, and for the reasons discussed above, Defendants' motion for summary judgment as to Plaintiff's Title VI claim is denied.

## II. **Equal Protection Claims**

Plaintiff brings claims against both the Defendant District and the individual Defendants under 42 U.S.C. §1983 alleging that, by refusing to take "any effective and reasonable steps" in response to complaints by Plaintiff of racial harassment, failing to train teachers or educate students about racial discrimination and failing to establish a process for investigating and remedying problems of harassment, Defendants demonstrated a custom or policy of deliberate indifference and "deprived Plaintiff of the right to attend school free of overt, pervasive and officially countenanced racial and national origin harassment."

Under the Equal Protection Clause of the Fourteenth Amendment, "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, (1985) (superseded by statute on other grounds) (citing Plyler v. Doe, 457 U.S. 202, 216 (1982). In order to establish a § 1983 claim for violation of the Equal Protection Clause of the 14th Amendment, "a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class."  Barren v.

Harrington, 152 F. 3d 1193 (9th Cir. 1998)(internal citations omitted) cert. denied, 525 U.S. 1154 (1999).  This includes making a threshold showing that the defendant treated the plaintiff differently from similarly situated individuals.  Freeman v. City of Santa Ana, 68 F.3d 1180, 1187 (9th Cir. 1995)

     To avoid summary judgment against her equal protection claims, Plaintiff must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that the Defendants' conduct, i.e. their *responses* to claims of harassment, was motivated by race or national origin discrimination.  See, Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001); Funez ex rel Funez v. Guzman, 687 F Supp. 2d 1214, 1225-26 (D. Or. 2009).  A plaintiff may establish improper motive by demonstrating either that the defendants intentionally discriminated or acted with deliberate indifference.  Flores v. Morgan Hill Unified Sch. Dist., 324 F.3d 1130, 1135 (9th Cir. 2003).

     Defendants contend that they are entitled to summary judgment on Plaintiff's equal protection claims because Plaintiff has neither pleaded nor shown the existence of evidence that she was treated differently by Defendants because of her race or national origin.  They argue that Plaintiff has merely reiterated and re-alleged her Title VI allegations in her equal protection claims and that the record is devoid of any evidence of disparate treatment or improper motive on the part of Defendants.

     In support of her equal protection claim, Plaintiff cites evidence cited in support of her Title VI claim and asserts that disparate treatment is established by the District's suspension of a student who had harassed a white student and the District's failure to suspend any student for harassing Plaintiff.   However, records before the court indicate only that, in the incident to which Plaintiff refers, a white female student was suspended for "fighting" with another student.

OPINION AND ORDER – 18

The disciplinary records also show that Plaintiff and a white female student received "time out" for "Disruptive Conduct" related to the same episode; that Plaintiff received "time out" for another incident of "Disruptive Conduct" for which a white student also received the same discipline for the same conduct and that three other white students received discipline ranging from a conference to "time out" for "Harassment" that allegedly targeted Plaintiff.

The record contains no evidence from which a trier of fact could reasonably conclude that the Defendants treated Plaintiff's complaints of harassment differently than other complaints of harassment, let alone that they did so for improper discriminatory reasons. There is, in fact, no evidence of Defendants' responses to any other alleged harassment. Plaintiff has failed to show evidence that could establish that she was treated differently from others similarly situated, based on an impermissible classification. As such, Plaintiff has not established a triable issue as to her equal protection claims against any of the Defendants. In light of this conclusion, I need not and do not reach the issue of qualified immunity for the individual defendants in this case.

Furthermore, to impose liability on a local governmental entity under §1983, a plaintiff must show: "(1) that [s]he possessed a constitutional right of which [s]he was deprived; (2) that the [entity] had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" Oviatt by and through Waugh v. Pearce, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting City of Canton v. Harris, 489 U.S. 378, 389-91 (1989)). Here, because Plaintiff's evidence fails to establish an equal protection violation, the first of the elements necessary for establishing liability against the District – deprivation of a "constitutional right" – is not met.

Defendants' motion for summary judgment on Plaintiff's equal protection claims is granted.

OPINION AND ORDER – 19

III. **Negligence Claims**

      In her Fourth and Fifth Claims for Relief, Plaintiff alleges that Defendants negligently failed to protect Plaintiff from harassment and bullying and asserts that Defendants' conduct constituted both common law negligence and negligence *per se.*

A. **Common Law Negligence**

      In order to prevail on a claim for common law negligence under Oregon law, the plaintiff must prove either that there existed "a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty," the breach of which is actionable or that the defendant's conduct "unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." Fazzolari v. Portland School Dist. No. 1J, 303 Or. 1, 17 (1987). This second, "general foreseeability," standard requires that the plaintiff show "(1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent." Solberg v. Johnson, 306 Or. 484, 490 (1988) (citations omitted).

      In addition, under Oregon's "physical impact rule," claims for negligently inflicted emotional distress require "'a physical injury that gives rise to emotional distress.'" Simons v. Beard, 188 Or. App. 370, 376 (2003) (quoting Chouinard v. Health Ventures, 179 Or. App. 507, 514-15 (2002)) (internal quotations and citations omitted). Liability for emotional distress alone is recognized only in limited circumstances. Hammond v. Central Lane Communications Center, 312 Or. 17, 23 (1991). Among the exceptions, liability for negligence can attach for purely psychic or emotional injury if a defendant has "infringed on some legally protected

OPINION AND ORDER – 20

interest apart from causing the claimed distress * * *." <u>Id</u>. at 23.  The term "legally protected

interest" means "an independent basis of liability separate from the general duty to avoid

foreseeable risk of harm" and which may stem from a "special relationship."  <u>Phillips v. Lincoln</u>

<u>County School Dist.</u>, 161 Or. App. 429, 432-33 (1999) (citing <u>Curtis v. MRI Imaging Services II</u>,

148 Or. App. 607, 615-18 (1997), <u>aff'd. on other grounds</u>, 327 Or. 9 (1998)).

 In her Second Amended Complaint, Plaintiff alleges that the parties' "special

relationship" existed because of state law which mandates school attendance and because of

Defendants' <i>in loco parentis</i> status during the school day.  Citing in her Response, <u>Nearing v.</u>

<u>Weaver,</u> 295 Or. 702 (1983) and <u>Shin v. Sunriver Preparatory School, Inc.,</u> 199 Or. App. 352

(2005), and without any further argument or analysis, Plaintiff asserts that Defendants had a

special relationship with Plaintiff.  At oral argument, Plaintiff alluded to a special relationship

having been established because Plaintiff confided in and relied upon staff members at

Kraxberger.  Plaintiff also asserts that Defendants had a specific legal duty under Title VI and

the Equal Protection Clause.[4]

1. "Special Relationship"

 Defendants contend that Plaintiff's reliance on <u>Shin</u> is misplaced.  I agree.  The court

there addressed a peculiar set of circumstances in which the plaintiff was a foreign student

attending a private boarding school and living in the home of a school employee as part of a

"homestay" program, all the while subject to a detailed "Homestay Agreement and Policy." <u>Shin,</u>

199 Or. App. at 354-55.   As a result of these arrangements, which "covered virtually every

aspect of plaintiff's life," <u>id.</u>  the court found that the school involved "was not at all like a

---

[4] At oral argument, Plaintiff asserted for the first time that an incident in which Plaintiff's head was allegedly shoved into a locker, causing her to subsequently suffer "several headaches," satisfied the physical impact rule.  I find this argument unpersuasive and, even with all inferences in Plaintiff's favor, find no evidence in the record to support a conclusion that the physical injury "gave rise" to Plaintiff's claimed emotional distress. <u>See</u> <u>Simons</u>, 188 Or. App. at 376 (2003).

typical high school" but one that "act[ed] in the parental role for plaintiff." Id. at 367 (alteration
in the original) (internal quotations omitted).   Noting that the determination of whether a special
relationship exists is a fact-driven process, the court held that "the relationship between an
international homestay student and a school, under the circumstances presented here, gave rise to
such a heightened duty on the part of the school to protect the student from emotional harm and
that the student's legally protected interest is sufficiently important to support the imposition of
liability for negligently causing emotional harm." Id. at 365-66.

    The facts before this court, viewed in the light most favorable to Plaintiff, do not begin to
approach the circumstances presented in Shin and do not support a conclusion that a special
relationship existed between the parties.  The hallmark of a special relationship is that

> the party who is owed the duty effectively has authorized the party who owes the
> duty to exercise independent judgment in the former party's behalf and in the
> former party's interests. In doing so, the party who is owed the duty is placed in a
> position of reliance upon the party who owes the duty;

Conway v. Pacific University, 324 Or. 231, 240 (1996).

Examples of such relationships are lawyer and client, physician and patient, principal and agent
and others of a similar nature. Curtis, 148 Or. App. at 619.  Neither party has cited, nor have I
found, any Oregon case that has held that such a relationship exists between a public school
student and his or her school.  While schools have a "duty of supervision" towards their students
that imposes "an obligation of reasonable precautions against foreseeable risks beyond those that
might apply to other persons," the determination of a school's negligence is still one based on the
"foreseeable risk of harm" and not on a *separate* legally protected interest. Fazzolari, 303 Or. at
20.

OPINION AND ORDER – 22

2. "Legally protected interest" based on Title VI or §1983

Plaintiff asserts, without any support or explanation, that an exception exists to the physical impact rule in this case because Defendants had "a specific legal duty under Title VI and the Equal Protection Clause to protect plaintiff from racial harassment."

Title VI prohibits programs that receive federal funding from discriminating on the basis of race. The statute conditions an offer of federal funding on a recipient's promise not to discriminate, in what amounts essentially to a contract between the Government and the recipient. Gebser v. Lago Vista Independent School Dist., 524 U.S. 274, 286 (1998) (discussing the similar operation of Title IX and Title VI). The Equal Protection Clause imposes liability on "[e]very person" who, under color of law, "subjects, or causes to be subjected, *any citizen* of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. §1983 (emphasis added).

There is no argument that Defendants here are not subject to the duties imposed by Title VI or §1983. However, there is nothing in the plain meaning of these statutes or in any cited case law interpreting them that persuades me that the duties imposed create "an independent basis of liability separate from the general duty to avoid foreseeable risk of harm." Any duty of the Defendants was not specific toward Plaintiff nor was it unique from the duty owed in general to not discriminate. Accordingly, the obligations imposed by these statutes are insufficient to create a separate legally protected interest for purposes of exempting Plaintiff's negligence claims from the physical impact rule.

The distinctions drawn in Shin between the school at issue there and a "typical" public school and the rationales in the cases cited above setting out circumstances in which a special

OPINION AND ORDER – 23

relationship or separate "legally protected interest" *does* exist, persuade me that no relationship or interest existed in this case such that Oregon's physical impact rule would not apply to bar Plaintiff's common law negligence claims.

## B.  **Negligence *Per Se***

Plaintiff here asserts a claim against all Defendants under a theory of negligence *per se* for violations of ORS 659.850, ORS 339.356, OAR 58-021-0045, OAR 58-021-0046, OAR 58-021-0049 and OAR 58-022-1140.

Negligence *per se* is not a separate claim for relief, but a theory of liability for negligence in which the standard of care is expressed by a statute or rule. Shahtout v. Emco Garbage Co., 298 Or. 598, 601 (1985).  "When a plaintiff . . . invokes a governmental rule in support of that theory, the question is whether the rule . . . nevertheless so fixes the legal standard of conduct that there is no question of due care left for a factfinder to determine; in other words, that noncompliance with the rule is negligence as a matter of law." Id.

Because negligence *per se* is merely a theory of liability for negligence and not a separate claim for relief, my conclusion that Oregon's physical impact rule bars Plaintiff's common law negligence claim also extends to preclude a claim for negligence based on any alleged statutory violations.  See, Simons, 188 Or. App. at 376; Shahtout, 298 Or. at 601.  In addition, having reached the conclusion that Plaintiff's negligence claims fail as a matter of law, I need not and do not reach the issue regarding the individual Defendants' liability under the Oregon Tort Claims Act.  Accordingly, and for the reasons discussed above, Defendants' motions for summary judgment as to Plaintiff's Fourth and Fifth Claims for Relief – the negligence claims – are granted.

OPINION AND ORDER – 24

**<u>Conclusion</u>**

Defendants' motions to strike, as set out in their Reply Memorandum (#83 ) are DENIED in part and GRANTED in part, as set out above.  Defendants' motion for summary judgment (# 61) is DENIED as to Plaintiff's Title VI discrimination claim and GRANTED as to the remainder of Plaintiff's claims.

DATED this 6th day of June, 2012

 /s/ John Jelderks
John Jelderks
U.S. Magistrate Judge

OPINION AND ORDER – 25